ALFRED CURTIS *vs.* NEW YORK, NEW HAVEN, & HARTFORD R. R. Co.

*JUNE 26, 1911.*

PRESENT:  Dubois, C. J., Blodgett, Johnson, Parkhurst, and Sweetland, JJ.

(1) *Evidence.  Photographs.*

Photographs of places and things for the purpose of aiding the jury in applying the facts proved to the particular case, are admissible.

(2) *Railroads. Signals.*

Section 3787, General Statutes, Connecticut, provides that the driver of an engine on a railroad shall commence sounding the bell or whistle when such engine is approaching and is within eighty rods of the place where the railroad crosses any highway at grade and shall keep such bell or whistle occasionally sounding until such engine has crossed such highway.

Request to charge that "If the jury find that the whistle was blown at the whistling post for the Union street crossing and the bell on the engine kept sounding occasionally as the train approached the crossing, then the defendant performed its whole duty, there being in evidence no exceptional circumstances making it necessary for the defendant to do anything further.

*Held,* properly refused since it neither conformed to the language of the statute or the construction placed upon it by the Supreme Court of Connecticut in *Tessmer* v. *R. R. Co.,* 72 Conn. 208.

(3) *Railroads. Signals.*

Request to charge "The jury cannot find the defendant negligent on the ground that the whistle was not again sounded between the whistling post for Union street crossing and the crossing itself after the regular crossing whistle had been blown."

*Held,* properly refused since it did not contain the further proviso that the bell was kept occasionally sounding until the engine had passed the crossing.

(4) *Railroads. Negligence. Signals.*

Evidence considered, and while conflicting, there being substantial testimony supporting plaintiff's contention that defendant did not perform its duty in giving the statutory signal, and conflicting evidence as to the due care of plaintiff, the verdict for plaintiff having the approval of the justice presiding at the trial, will not be disturbed.

TRESPASS ON THE CASE for negligence. Heard on exceptions of defendant and overruled.

JOHNSON, J. This is an action of trespass on the case for negligence brought by Alfred Curtis, of the City of Middletown, state of Connecticut, against the New York, New Haven & Hartford Railroad Company, to recover damages for injuries to both his person and property suffered as the result of a collision between a train of the defendant and a team driven by the plaintiff, at the Union street crossing in said Middletown.

It appears from the evidence that on the 16th day of November, A. D. 1908, the plaintiff drove with a horse and wagon through South street, a public highway in said Middletown, and across the tracks of the defendant and proceeded to the junction

of South and Union streets, where he turned to the left to cross the tracks of the defendant on Union street.

South street and Union street, two adjacent streets, run practically north and south, gradually converging until they meet just north of the railroad track, in the vicinity of Cole's grain mill. As they do not meet until they cross the track to the north, there are two plank crossings, the centers of which are 70 feet apart on the main track. There is a siding or spur track north of the main track, which extends some distance to the west, and for some distance east of the crossing. East of the crossing is a covered railroad bridge, distant from the center of Union street crossing 525 feet. Farther to the east is a whistling post for this crossing, which is distant from the center of South street 1,295 feet, and distant from the center of Union street, 1,365 feet. 150 feet nearer to the Union street crossing than the whistling post is the Omo Manufacturing Company, situated to the left of the track as one approaches the covered bridge. 807 feet farther east than the whistling post is the New England Enamel Company. This brings the whistling post between the Omo Manufacturing Company and the New England Enamel Company. The railroad to the east of the crossing curves approximately four degrees. South street and Union street, after meeting north of the railroad, extend down a grade to the left and right of Cole's grain mill, respectively. The extension to the right of Cole's mill is called the River road, and crosses the Summer Creek by means of a bridge. This bridge is distant from the Union street crossing perhaps 75 or 100 feet. North of the main track and spur track, and just east of the South street crossing, there is a storehouse owned by Cole's mill, into which grain is unloaded from cars which are put on the spur track for that purpose.

The plaintiff's declaration is in two counts, the first charges negligence because of the high speed of the train and failure to give a proper warning of its approach. The second count is based on the statutory obligation that requires the defendant to blow its whistle within eighty (80) rods of a grade crossing, and keep the whistle or bell on the engine occasionally sounding until the highway is passed.

The court at the trial to the jury, under the decision of the Supreme Court of Connecticut, in the case of *Tessmer, Admr.* v. *N. Y., N. H. & H. R. R. Co.* 72 Conn. 208, eliminated all grounds of recovery except the question of the failure on the part of the defendant to comply with the statute laws of the State of Connecticut with reference to the duty imposed to blow the whistle and ring the bell.

The case was tried before Mr. Justice Stearns and a jury on the 13th, 14th, 15th, 16th and 17th days of June, A. D. 1910, and a verdict was rendered for the plaintiff in the sum of eighteen hundred (1800) dollars.

The defendant duly filed its motion for a new trial upon the following grounds:

1. The verdict is against the law.

2. The verdict is against the evidence and the weight thereof.

3. The verdict is against the law and the evidence and the weight thereof.

4. The defendant has discovered new and material evidence which it had not discovered at the time of the trial of said cause, and which it could not have discovered at such time by the exercise of reasonable care.

Said motion was argued before Mr. Justice Stearns and denied. The defendant then filed its bill of exceptions and the same was allowed by the court as follows:

" 1.   To a ruling of said justice, at said trial, permitting the introduction of photograph 'Y,' marked Plaintiff's Exhibit ' C,' as appears on page 122 of the transcript of testimony, etc., in said case, filed herewith.

" 2.   To the refusal of said justice, at said trial, to direct a verdict for the defendant, as appears on page 347 of said transcript.

" 3.   To the refusal of said justice, at said trial, to charge the defendant's first request, as appears on pages 365 and 376 of said transcript.

" 4.   To the refusal of said justice, at said trial, to charge defendant's fifth request, as appears on page 376 of said transcript.

"5.   To the specific instructions given by the court to the jury at said trial, said instructions appearing on pages 373, 374 and 375 of said transcript, the exception thereto appearing on page 374 of said transcript.

"6.   To the decision of said court denying the defendant's motion for new trial on the ground that the verdict is against the law. ·

"7.   To the decision of said court denying the defendant's motion for new trial on the ground that the verdict is against the evidence and the weight thereof.

"8.   To the decision of said court denying the defendant's motion for new trial on the ground that the verdict is against the law and the evidence and the weight thereof."

The case is before this court on said exceptions.

(1) The first exception is to the admission in evidence of a photograph "Y," marked plaintiff's exhibit "C," as appears on page 122 of the transcript of testimony.   Defendant's counsel objected because certain cars appeared in the photograph which were not the same cars or in the same place as on the day of the accident.   On page 122, the court said: "I think I will allow that and I will have it covered over, if you want, and note your exception to its allowance."   MR. SWEENEY:   "I don't think any good would be done by pasting something over."   THE COURT:   "I will admit it."

In his charge to the jury the court said (p. 350):   "When, at the time the photograph generally showing the bridge there, etc., was offered, I cautioned you that there was a car represented there which was not there at the time of the accident and that you are not to take that into consideration in figuring on the question of liability, that the photograph was simply introduced for the sake of illustrating the general layout of the land, and curve of the track, the railroad bridge and the slope of South street I believe is there."

The admission of photographs of places and things for the purpose of aiding the jury in applying the facts proved to the particular case, is a matter of almost everyday occurrence in the courts.   We think we have not before been called upon

to pass directly upon the question. The admissibility of photographs in evidence is however well established in our practice; and is supported by numerous cases in other jurisdictions. Thus, in *Dederichs* v. *Salt Lake City R. Co.*, (Utah) 35 L. R. A. 802, 807, the court by Miner, J., speaking of photographs excluded by the court below, said: "These photographs exhibited the surface condition of the streets, buildings, trees, cars, railroad track, poles, and distances, and would, no doubt, carry to the minds of the jury a better image of the locality of the accident and its surroundings, concerning which testimony was offered, than any oral description. Their accuracy as a faithful representation of the locality was shown as compared to the time of the accident. We think it must be deemed to be established that photographic scenes are admissible in evidence as appropriate aids to the jury in applying the evidence whether it relates to persons, things, or places. It is a well-established rule, applied in every-day practice in courts, that diagrams and maps illustrating the scenes of a transaction, and the relative location of objects, if proved to be correct, are admissible in evidence, in order to enable the court or jury to understand and apply the established facts to the particular case. And it is difficult to see why a plain picture or representation produced by the art of photography is not admissible on like principles, if verified as a correct representation of the locality. If any difference had arisen concerning the photographs being taken at a different season of the year, it could have been explained." *Johnson* v. *U. P. R. Co.* (Utah) 100 Pac. 390; *Harrison* v. *Green*, 157 Mich. 690; *Alberti* v. *N. Y. L. E. & W. R. Co.* (N. Y.) 6 L. R. A. 765; *Com.* v. *Robertson*, 162 Mass. 90. See also cases collected in note to *Dederichs* v. *Salt Lake City R. Co.*, 35 L. R. A. 802, *supra*.

The admission of the photograph was proper, and with the explanation and caution given to the jury by the court the rights of the defendant were further sufficiently safeguarded.

The third exception is to the refusal by the court of the defendant's first request to charge the jury as appears on page 347 of the transcript, as follows: "If the jury find that the

whistle was blown at the whistling post for Union street crossing, and the bell on the engine kept sounding occasionally as the train approached the crossing, then the defendant performed its whole duty, there being in evidence no exceptional circumstances making it necessary for the defendant or any of its servants to do anything further, and the verdict therefore should be for the defendant."

The court had instructed the jury that the law of Connecticut governed the case, and had read to the jury sections 3786 and 3787 of the general statutes of Connecticut, revision of 1902: "SECTION 3786. Every engine used upon a railroad shall be supplied with a bell of at least thirty-five pounds weight and shall have a steam whistle, which bell and whistle shall be so attached to said engine as to be conveniently accessible to the engineer, and in good order for use.

"SEC. 3787. Every person controlling the motions of an engine on a railroad shall commence sounding the bell or whistle when such engine is approaching and is within eighty rods of the place where the railroad crosses any highway at grade and shall keep such bell or whistle occasionally sounding until such engine has crossed such highway."

The court had also quoted from the opinion of the court in *Tessmer, Admr.,* v. *New York, New Haven & Hartford Railroad Company,* 72 Conn. 208, construing said statute, as follows: "The practical construction put upon section 3554 (which is the same section as Bells and Whistles) has been that of common sense, that the whistle shall be sounded at the eighty rod point, and the bell shall be rung thereafter until the engine passes the crossing."

The request is faulty. The words "and the bell on the engine kept sounding occasionally as the train approached the crossing," are not equivalent to the words of the statute, "and shall keep such bell or whistle occasionally sounding until such engine has crossed such highway," or to the language of the Supreme Court of Connecticut in the *Tessmer* case construing said statute: "that the whistle shall be sounded at the eighty rod point and the bell shall be rung thereafter until the engine passes the cross-

ing." The words, "until the engine passed the crossing" were needed in the request in order to comply with the law as laid down in the *Tessmer* case. The request was properly refused.

(3) The defendant's fourth exception is to the refusal of its fifth request to charge the jury as appears on page 376 of the transcript, as follows: "The jury cannot find the defendant negligent on the ground that the whistle was not again sounded between the whistling post for Union street crossing and the crossing itself after the regular crossing whistle had been blown."

The court had charged the jury (pp. 374-5) as follows: "The defendant is bound to blow its whistle 80 rods from the crossing and ring its bell occasionally, or blow its whistle occasionally, from the time the first signal is given until the crossing is passed. That is the positive duty cast upon the defendant by the statute and which they must live up to. A single ringing of the bell of the locomotive would not come up to the test required by the law.

"MR. SWEENEY—Will your Honor note an exception to that part of this specific request which has to do with the occasional blowing of the whistle?

"THE COURT—If there is any misunderstanding about that, Gentlemen, the statute provides that the locomotive bell or the whistle, either one, shall be occasionally sounded from the time the first locomotive whistle is blown, 80 rods from the crossing. If the railroad company, having given its locomotive whistle, which they must give 80 rods from the crossing, then they have the option of either blowing their whistle occasionally or ringing their bell occasionally. If they do either one of these things and blow the whistle then they have discharged the duty which the law of Connecticut places upon them. Does that cover your point?

"MR. SWEENEY—No, it does not. It is my contention that the Connecticut court has construed that statute to mean blowing the whistle at the whistling post and after that ringing the bell occasionally and the Court has especially held that there is no duty incumbent on the railroad company to blow the whistle after passing the whistling post.

"The Court—That is true, but if they ring the bell and they have the option of doing one or the other. There is no claim here that they did blow the whistle after leaving the whistling post. They claim that they blew the whistle at the whistling post 80 rods away, and after that time they rang the locomotive bell until they got to the crossing. If that is true then they have sustained the duty which is cast upon them."

It would have tended to confuse and mislead the jury to give the instruction in the exact words of the request, and the court could not properly give it without referring also to the ringing of the bell. The statement is not true that "the jury cannot find the defendant negligent on the ground that the whistle was not again sounded between the whistling post for Union street crossing and the crossing itself after the regular crossing whistle had been blown," unless there is coupled therewith the proviso that the bell was kept occasionally sounding until the engine had passed the crossing. The court had properly instructed the jury. The request was properly refused.

The fifth exception is covered by what has been said as to the fourth.

We pass now to the consideration of the remaining exceptions.

The court, under the decision of the Supreme Court of Connecticut in the *Tessmer* case, had eliminated all grounds of recovery except that of failure on the part of the defendant to comply with the statute of Connecticut with reference to the duty of blowing its whistle and ringing its bell when approaching a crossing at grade. Upon this question there was some conflict of testimony.

(4) Edward T. Ball, called by plaintiff, testified, p. 47 of the transcript: "Q. 35. Now where did you first see that train? Ans. I see it just before it came through the railroad bridge. Q. 36. Do you mean by that, the covered bridge? Ans. Yes, sir. Q. 37. Now, from the time—during the time you were there did that train, to your knowledge, blow any whistle or ring any bell? Ans. No, sir, it didn't."

John Holt, a witness called on behalf of the plaintiff, testified,

transcript pp. 69, 70, that he saw the train all the way through from the enamel shop up to where the accident happened. He testified (pp. 71–2): "Q. 45. Now, after it left the covered bridge, did you hear any whistle blow, or signal of any kind given? Ans. Signal on the crossing. Q. 46. And when was that signal given with reference to the time of the accident? Ans. Why, just as he was on the crossing. Q. 47. Just as who was on the crossing? Ans. Mr. Curtis. Q. 48. And on which crossing? Ans. Union street crossing, where he was struck." Mr. Holt continued (p. 72): "Q. 52. Where was Mr. Curtis when the first signal you heard was given? Ans. What signal do you mean, from the train or what? Q. 53. From either the train or the crossing. Ans. Well, the first signal I heard from the train was the whistle and that was clear down to the Enamel Shop. I don't know where Mr. Curtis was then. Q. 54. I mean, after the train got through the covered bridge. Ans. I know Mr. Curtis was on the corner when I heard the gong to the crossing. Q. 55. Whether or not that was the first signal you heard given after the train left the covered bridge? Ans. Yes."

Peter Melien, a witness called on behalf of the plaintiff, on p. 92 testified as follows: "Q. 44. Did you hear any whistle blow that day? Ans. No, sir. Well, I heard one above. Q. 45. Where was it above? Ans. Up within the other shop. Q. 46. Up at the other shop? Ans. The Omo, as they call it. Q. 47. From that time until your attention was called to the accident, did you hear any signal of any kind? Ans. No; I didn't. Q. 48. Did you hear any whistle blow? Ans. No, sir. Q. 49. Any bell rung? Ans. No, sir. Q. 50. No signal of any kind? Ans. I didn't hear. Q. 51. Is your hearing good? Ans. It is supposed to." On cross-examination, he testified that he saw Mr. Curtis on the South street crossing. He was asked, p. 92, "C. Q. 53. On the crossing; and you heard, at that time, the electric bell on the crossing ringing, did you not? Ans. I couldn't say, I say, exactly if I did, what I did. Of course I had a team on the bridge to take care of. I couldn't say exactly. C. Q. 54. Do you remember,—recognize

that gentleman sitting over at the table?  Ans.  I said I think I heard bells, but I was not sure.  C. Q. 56.  What bell did you mean?  Ans.  Electric bell.  C. Q. 57.  Didn't you tell that gentleman over there,—Mr. Phillips,—that you heard the electric bell ringing on the crossing?  Ans.  Not for sure.  C. Q. But you think you did?  Ans.  I think I told,—for sure.  C. Q. 59.  What is that?  Ans.  I might hear it, I say, and I say that now.  C. Q. 60.  I just want to be sure about it.  You don't mean to say that it was not ringing?  Ans.  No, I ain't saying it was ringing, and I ain't saying it was not ringing for sure. C. Q. 61.  Don't you think it was ringing, as a matter of fact? Ans.  I didn't say either way.  I ain't sure either way.  C. Q. 62.  Well, now, with regard to this conversation you had with Mr. Phillips, didn't you tell him—Ans.  I told him I warn't sure what bell rung.  C. Q. 63.  Then, I understand you to say you didn't tell him, in so many words, that it was ringing? Ans.  (No answer).  C. Q. 64.  Please answer?  Ans.  I didn't. C. Q. 65.  You didn't?  Ans.  I told him same way as I do now. I had trouble with my team.  I didn't see any ways—."

Alfred Curtis, plaintiff, called as a witness, testified (transcript p. 140):  "Q. 25.  As you approached South street, what did you do if anything?  Ans.  Well, I looked for a train.  I knew it was some near.  Q. 26.  And what did you do to look for the train?  What did you do?  Ans.  I looked and listened both ways.  Q. 27.  How far were you from the track when you did that?  Ans.  I was most to the track.  I could not tell exactly.  Right close by.  Q. 28.  Did you see any train? Ans.  No, sir.  Q. 29.  Did you hear any whistle?  Ans.  No, sir.  Q. 30.  Did you hear any signal of any kind?  Ans. Nothing of any kind; no, sir.  Q. 31.  What did you do then? Ans.  I passed down the descent and swung round to go on Union street.  Q. 32.  You swung around to go on to Union street?  Ans.  Yes, sir.  Q. 33.  As you approached Union street what d'd you do?  Ans.  I looked for a train.  Q. 34. Did you see any?  Ans.  No, sir.  Q. 35.  What track did you cross first?  Ans.  I crossed that track that had the freight car on, box car.  Q. 36.  When you got across that track, what

did you do? Ans. I looked and listened for a train. Q. 37. Did you see any train? Ans. No, sir. Q. 38. Did you hear any train? Ans. No, sir. Q. 39. Did you hear any signal? Ans. No, sir. Q. 40. Where were you when you first saw the train? Ans. My horse was on the track and I was,—my forward wheel was just coming on the track."

Robert Johnson, whose deposition was taken on behalf of the plaintiff, testified (transcript pp. 185-6), that he was standing about six feet from the corner of Cole's Mill, sorting over bags: "Int. 46. Before you went in did you hear the train blow at any place? A. Yes, sir, I heard the train whistle, I should judge between the Omo and the New England Enameling Company she whistled. Int. 47. And by the New England Enameling Company do you mean the tin shop? A. Yes, sir. Int. 48. How much whistle did it give? A. Why, she whistled, I don't know how much—one whistle I should judge. Int. 49. One whistle? A. She whistled one time, that is all. Int. 50. And that was where? A. Between the Omo and the New England Enameling Company. Int. 51. From that time on until after you saw Mr. Curtis hurt did the train whistle again? A. No, sir; I didn't hear it. Int. 52. Did any bell on the engine ring? A. I didn't hear it." He went in the mill when the plaintiff was stopped on Union street about two feet from the crossing. Just as the plaintiff stopped the electric bell rang. In cross-examination, when asked if he did not remember hearing the bell on the engine ring, be answered, "I don't remember, you know, because I never paid no attention,—never thought no accident was going to happen—it may have rung for all I know, but I didn't hear it."

The defendant called Robert McKeon as a witness to testify as to the ringing of the bell. On p. 219 of the transcript he testified on the direct. "Q. 46. In regard to the bell on the engine, Mr. McKeon, will you tell us whether or not you heard that? Ans. Very plainly, distinctly."

John F. Dovin, called as a witness by the defendant, testified, on p. 238 of the transcript: "Q. 35. I will ask you with respect to hearing any signals on the train? Ans. Yes, sir.

Q. 36. What was it you heard? Ans. I heard the whistle. Q. 37. Did you hear anything else? Ans. The bell. Q. 38. With regard to the electric bell on the crossing, did you hear that? Ans. Yes, sir. Q. 39. With reference to bell on the engine? Ans. It was ringing all right."

Joseph Hildenbrund, called as a witness on behalf of defendant, testified (pp. 254, 255 of transcript): "Q. 22. (BY MR. SWEENEY). A short time prior, Mr. Hildenbrund, a short time prior to the occurrence of this accident did you hear any signals given by any train? Ans. I did. Q. 23. What were these signals? Ans. I heard the first and the whistle at the Enamel Company. Q. 24. At the Enamel Company? Ans. Yes, sir. Q. 25. Did you hear any other whistle? Ans. I heard another whistle before he comes to the bridge, the covered bridge. Q. 26. You did? Ans. Yes. Q. 27. In reference to the place where the second whistling occurred, was that near the Omo Manufacturing Company? Ans. That is the Omo Manufacturing Company. Q. 28. Near the Omo Manufacturing Company? Ans. Yes. Q. 29. Now, with regard, Mr. Hildenbrund, to the electric bell on the crossing, did you hear that? Ans. Yes, sir. Q. 30. And when did you hear it? Ans. The second whistle and the bell stopped ringing at the same time. Q. 31. The same time you heard the second whistle? Ans. Yes sir. Q. 32. You had been sitting outside the mill, I believe? Ans. I had. Q. 33. Then you went into the mill? Ans. I went in the mill when the train passed me, going to the mill, the boiler room. Q. 34. Now, what I am getting at, Mr. Hildenbrund, is this: You were seated outside, outside the mill, were you? Ans. Yes, sir. Q. 35. And then you went inside the mill? Ans. Yes, sir. Q. 36. Now, how soon after going inside the mill did you,—or, did you hear anything after going inside the mill? Ans. I was in one second and the train stopped quick. I ran out."

George Deacon, called by the defendant, testified he was the engineer on the train, and on p. 318, transcript, testified as follows: "Q. 56. Now, Mr. Deacon, with regard to the bell on the engine after passing the whistling post to the Union street

crossing, what have you to say to that? Ans. The bell was ringing. Q. 57. And continued to ring as you approached Union street crossing? Objected to; objection sustained."

The fireman, Jeremiah J. Deneene, however, testified, p. 327, transcript,—"Q. 7. Now, Mr. Deneene, when passing the whistling post for the Union street crossing, what, if anything, did you hear, or what, if anything did you do? Ans. I heard him blowing the whistle for the crossing. I was up with the string ringing the bell. Q. 8. As you continued to approach Union street crossing,—with regard to the ringing of the bell? Ans. I continued ringing the bell all the way."

Henry A. May, called as witness on behalf of the defendant, testified he was a baggage master, and on p. 334 of the transcript says: "Q. 11. Now, Mr. May, on the accident in question, passing the whistling post for Union street crossing what, if anything, do you remember in regard to any signals? Ans. I remember the engineer blowing the crossing whistle. Q. 12. And as the train approached Union street crossing, what if anything do you remember in regard to the engine bell? Ans. The bell was ringing."

Daniel C. White, the conductor of the train testified (p. 338): "Now, Mr. White, in passing the whistling post for Union street crossing, will you tell us what, if anything, you heard in respect to signals? Ans. I heard the customary signals given that day. Q. 6. What are the customary signals? Ans. The grade crossing, south of the bridge, ringing the bell."

William F. Octerberg, a brakeman, called on behalf of the defendant, testified (transcript p. 342): "Q. 7. And as the train continued to approach Union street crossing, what if anything have you to say in regard to the engine bell? Ans. I heard the bell."

From the testimony of the defendant's witnesses, and some of those for the plaintiff, it appears that the defendant substantially performed the duty imposed upon it by the statute, so far as the blowing of the whistle at the whistling post was concerned. Upon the question of its performance of the duty to sound the whistle or ring the bell occasionally after passing

the whistling post, until the engine had passed the crossing, the evidence is conflicting. The plaintiff testified that he heard no bell or whistle. Bell testified that from the time the train passed through the covered bridge it blew no whistle and rang no bell. Holt testified that he heard the whistle down at the Enamel Shop and that after the train left the covered bridge the gong on the crossing was the first signal he heard. Melien heard the whistle up at the Omo Manufacturing Company and from that time did not hear any other signal until the accident. As to whether he heard the electric bell on the crossing ringing when the plaintiff was on South street he was uncertain, and said in regard to his conversation with Mr. Phillips: "I told him I warn't sure what bell rung." Johnson heard the whistle between the Omo Manufacturing Company and the Enamel Works; did not hear the whistle again and didn't hear the bell on the engine ring. On cross-examination, he said: "I don't remember you know, because I never paid no attention, never thought no accident was going to happen—it may have rung for all I know, but I didn't hear it." Of the witnesses for the defendant, Hildenbrund heard one whistle at the Enamel Company and a second one at the Omo Manufacturing Company. He heard the electric bell on the crossing and it and the second whistle stopped at the same time. McKeon, Dovin, Deacon, May and Octerberg all testified that the engine bell rang. White, the conductor, said that he heard the customary signals, and that the customary signals were: "The grade crossing, south of the bridge, ringing the bell." None of these witnesses stated where or when the bell was rung, the nearest approach to such statement being that it was as the train approached the Union street crossing. Deneene, the fireman, however, testified that he continued ringing the bell all the way. He was the only witness for the defendant who testified to such continued ringing of the engine bell.

The defendant's contention is that it performed the duty imposed upon it as to the giving of the signals required by the statute, and that the plaintiff was guilty of such contributory negligence as to preclude a verdict in his favor. Although the

evidence was conflicting there was substantial evidence supporting the plaintiff's contention that the defendant did not perform its duty of ringing the bell upon the engine as the train approached the crossing and until the engine passed the crossing.  There was also evidence, both *pro* and *con*, upon the question of the exercise of due care by the plaintiff in driving upon the track.

Defendant's motion for the direction of a verdict for the defendant was properly denied.

The jury found for the plaintiff.  The justice who sat at the trial and heard the testimony has denied the defendant's motion for a new trial.  In these circumstances this court will not disturb the verdict.

The defendant's exceptions are severally overruled.  The case is remitted to the Superior Court with direction to enter judgment upon the verdict.

*Lyman & McDonnell, Charles S. Hamilton,* for plaintiff.
*Joseph C. Sweeney, Eugene J. Phillips,* for defendant.