**STATE**

v.

**Evelyn K. PULPHUS.**

**No. 81–158–C.A.**

Supreme Court of Rhode Island.

Aug. 30, 1983.

**154**

Dennis J. Roberts II, Atty. Gen., Margaret R. Levy, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Chief Appellate Atty., Janice R. Weisfeld, Asst. Public Defender, Providence, for defendant.

## OPINION

SHEA, Justice.

The defendant, Evelyn K. Pulphus (Pulphus), appeals from a Superior Court jury conviction of obtaining money from another by means of false pretenses in violation of G.L.1956 (1969 Reenactment) § 11–41–4.[1] In support of her appeal, Pulphus raises the following issues: (1) the State failed to lay

---

1. In 1981 the Legislature reenacted § 11–41–4 without change. General Laws 1956 (1981 Reenactment) § 11–41–4 provides:

   "Every person who shall obtain from another designedly, by any false pretense or pretenses, any money, goods, wares, or other property, with intent to cheat or defraud, and every person who shall personate another or who shall falsely represent himself to be the agent or servant of another, and shall thereby receive any money or other property intended to be delivered to the person so personated, or to the alleged principal or master of such agent or servant, shall be deemed guilty of larceny."

a proper foundation for bank surveillance photographs introduced at trial, and (2) identification testimony was based on an impermissibly suggestive photographic array. We affirm.

We will first recite the facts that were established at trial. In the late morning hours of August 29, 1977, then-seventy-six-year-old Dena Beck (Dena) left her home on Dartmouth Street in Pawtucket. Enroute to the bus stop, Dena encountered two women who were seated in an automobile. They showed Dena a billfold containing a large sum of money and told her they would get her additional money if she gave them some of her money in return. After speaking with the women for about an hour, Dena acceded to their request for money. She then got into the car and the two women drove Dena home where she picked up her bankbook.

The women then took Dena to the main office of People's Savings Bank located at 145 Westminster Street in Providence. Pulphus accompanied Dena into the bank and told her to get the money in cash. The other woman, identified only as a black woman, waited in the car.

Inside the bank, Dena spoke with Guy Buzzell (Buzzell), the then-assistant manager. She told Buzzell that she wanted a passbook loan in the amount of $26,000. Dena stated she needed the money so that her nephew could open up a hardware store. Dena also told Buzzell that in order to satisfy a supplier, she needed cash.

Because the bank did not have $26,000 in cash on hand, Buzzell could only give Dena $16,000 in cash. Dena gave this cash to Pulphus who placed it in her handbag. Buzzell also gave Dena a $10,000 check made out to "cash" and advised her to cash it at the Westminster Mall office of People's Bank located at 256 Westminster Street. Dena and Pulphus left the bank and joined the black woman, who was waiting outside, and proceeded to the Westminster Mall branch. Once again, Pulphus accompanied Dena into the bank while the black woman waited outside. The West-minster Mall branch did not have enough cash to cover the $10,000 check, and the teller returned it to Dena. She and Pulphus left the bank and joined the black woman. The threesome then went to dinner.

After leaving the restaurant, Pulphus and the black woman brought Dena home. Pulphus went inside the house with Dena, and the black woman left. Approximately two hours later, Dena's niece, Hannah Field (Hannah), telephoned and invited Dena to her house. When Dena replied that she had a visitor, Hannah told her to bring the visitor along. Hannah's son picked up Dena and Pulphus and drove them to the house, where they stayed for about an hour. While there, Pulphus spoke with both Hannah and her husband, Paul. She told Hannah that she was the daughter-in-law of one of Dena's friends, and that her husband had recently died in a truck accident. Pulphus said that she was in Providence to settle some matters. Neither Pulphus nor Dena mentioned that they had withdrawn money from the bank. Later, Hannah's son drove Dena and Pulphus back to Dena's home. Later, Pulphus received a telephone call from the black woman. After she hung up, Pulphus told Dena that she had to leave. Dena then said, "This is a flimflam. I want my money." Pulphus quickly absconded with the $16,000.

Two days later, on August 31, Dena returned to the main office of People's Savings Bank. Dena gave the $10,000 check to Buzzell and told him to apply it against the passbook loan because her nephew didn't need the money.

The following day, Dena once again returned to the bank. She informed Buzzell that she wanted to repay the entire loan she had negotiated three days earlier. Eventually, Dena explained that she had been tricked out of the money and that she had notified the Pawtucket police. However, when Buzzell called the police, they informed him that they had no record of any complaint made by Dena. As a result, Buzzell contacted the Providence police and ac-

companied Dena to the station. At the police station, Dena explained the story to Detective Robert Trafford.

On Friday, September 2, Hannah read a newspaper article about a swindle and realized the story concerned her aunt, Dena. Hannah immediately contacted the Providence police department. Sometime thereafter, she and her husband, Paul, went to the police station and spoke with Detective Trafford. Hannah stated that on August 29, Dena and another woman had visited their home. A few weeks later, on or about September 20, Hannah and Paul returned to the police station for the purpose of examining a group of approximately nine photographs. The group contained two pictures of Pulphus that were taken almost three years apart. Pulphus appeared quite different in each photo. Hannah identified both photographs of Pulphus as the woman who had visited their house on August 29. Paul, on the other hand, only identified one photograph of Pulphus.

As part of his investigation, Detective Trafford requested certain surveillance photographs from the main office and the Westminster Mall branch of People's Bank. When Trafford examined the photographs, he recognized Dena. Later he recognized Pulphus as the woman who had accompanied Dena into the bank.

At trial, the State introduced a group of the bank surveillance photographs of Dena and Pulphus at both the main office and the Westminster Mall branch of People's Bank. Buzzell, the then-assistant manager of the main office, explained that the photographs were taken automatically by bank cameras. He testified that a permanently installed camera, which is directed at a clock and calendar, as well as at the patrons at the tellers' windows, produces a record of the time and date the photograph was taken. Buzzell testified that the four photographs, state's exhibit Nos. 1 through 4, accurately portrayed the main office of People's Bank. Exhibits 1 through 4 indicate that they were taken on August 29, 1977. Buzzell stated that exhibits 1 through 3 portray

Dena Beck and that in exhibits 2 and 3, Dena is accompanied by another person who appears to be female. These exhibits were introduced into evidence *without objection.*

The state also offered two other surveillance photographs taken by the automatic camera inside the Westminster Mall branch of People's Bank, where Dena said she and Pulphus had gone after leaving the main office in order to cash the $10,000 check. Defense counsel objected to the introduction of these photographs on the ground that the calendar in the photographs portrayed an August 25 date rather than an August 29 date.

A security officer for People's Bank, Frank Vincent (Vincent), testified that he is responsible for the security photographs that are taken at the various locations of People's Bank. Vincent had personally checked the records with respect to the photographs taken at the Westminster Mall office on August 29, 1977. He testified that the film, from the various cameras in People's facilities, is processed by a company called Distribution Associates, which maintains a three-year file of all the negatives taken at the various branches. He stated that a roll of film usually lasts for one week and that Distribution Associates assigns each roll a negative number. By checking the records, Distribution Associates determined that negative number 734054 was assigned to the film taken at the Westminster Mall branch during the week of August 29, 1977.

Vincent testified without objection that exhibits 6 and 7 portrayed the inside of the Westminster Mall branch. These photographs were developed from negative number 734054. He also stated that Distribution Associates was able to determine the exact date that these exhibits were taken by verifying them through the daily process. Vincent explained this process to the court and jury as follows. Once one determines what week the film was taken, it is possible, because the equipment is operated automatically, to count the exposed and blank spaces on the film to establish the

actual date of a photograph regardless of the date shown on the calendar. Vincent said that the date, August 25, shown beneath the clock in the photograph was incorrect, but that it was not uncommon for the tellers to forget to change the tags that represent the date.

Vincent testified that exhibit 6 portrayed an elderly lady in the company of another woman wearing a striped, hooded jersey with drawstring ties. The woman had short hair and was wearing glasses. He also testified that exhibit 4, which was taken at the main office, portrays the same woman dressed in the same manner. The clock and calendar in exhibit 4 shows that the photograph was taken at 2:25 p.m. on August 29, 1977. The clock in exhibit 6 shows that it was taken at 2:50 p.m. In addition, Dena· testified that immediately after leaving the main office, where exhibit 4 was taken, she and Pulphus went to the Westminster Mall branch, where exhibit 6 was taken. The woman portrayed in both of the photographs matched the descriptions provided by Hannah and Paul. Hannah and Paul saw her for approximately one hour during the evening of August 29.

## I

Defense counsel moved to exclude and strike from the evidence exhibits 6 and 7, two of the photographs taken at the Westminster Mall branch, on the ground that they were not properly authenticated be-

cause they had an incorrect date. The trial justice denied the motion and admitted the photographs. On appeal, Pulphus claims that the trial justice erred by denying her motion to exclude the photographs.

■ For the admission of photographic evidence, we have always required that an adequate foundation be laid. We have consistently held that a proper foundation requires testimony that the photograph is a fair and accurate representation of facts personally observed by the witness. *See State v. Sangermano*, 111 R.I. 196, 202–03, 301 A.2d 80, 83 (1973); *State v. Giragosian*, 107 R.I. 657, 667–68, 270 A.2d 921, 927 (1970); *State v. Esposito*, 73 R.I. 94, 100, 54 A.2d 1, 4 (1947); *McCormick's Handbook of the Law of Evidence* § 214 at 530–31 (2d ed. Cleary 1972). Also, before a photograph can be admitted into evidence, the court must be satisfied that it is relevant, that is, it is "evidence that tends to prove or disprove a point provable in the case." *Lacey v. Edgewood Home Builders, Inc.*, R.I., 446 A.2d 1017, 1019 (1982); *accord State v. Kieon*, 93 R.I. 290, 295, 175 A.2d 284, 287 (1961).[2]

■ Until today, the courts of this state have admitted photographs purely as demonstrative evidence. The photograph is not evidence in itself, but merely a nonverbal method of expressing a witness's testimony.[3] As such, it is admissible only when a witness can testify that it is a fair and

2. *State v. Kieon*, 93 R.I. 290, 295, 175 A.2d 284, 287 (1961) also discusses the concept of materiality. This concept is, however, embodied in our current definition of relevance.

3. *See, e.g., State v. Sangermano*, 111 R.I. 196, 301 A.2d 80 (1973) (photograph admissible after officer testified that it was a fair and accurate representation of a room where defendant attempted to burn evidence); *State v. Giragosian*, 107 R.I. 657, 270 A.2d 921 (1970) (photograph admitted to augment officer's testimony concerning defendant's appearance); *State v. Bennett*, 92 R.I. 316, 168 A.2d 282 (1961) (photograph admitted after store manager stated it was a fair and accurate representation of the store); *Williams v. Altruda*, 74 R.I. 47, 58 A.2d 562 (1948) (photograph of plaintiff wearing a back brace admissible to augment his testimo-

ny); *State v. Esposito*, 73 R.I. 94, 54 A.2d 1 (1947) (photograph admissible to show identity of the person who was a confederate of defendant in the commission of the alleged crime); *State v. Smith*, 70 R.I. 500, 41 A.2d 153 (1945) (photograph of corpse admissible to show nature and position of wounds); *State v. Miller*, 52 R.I. 440, 161 A. 222 (1932) (photograph admitted to prove nature of wounds, identity, and cause of death); *Curtis v. New York, New Haven & Hartford R.R. Co.*, 32 R.I. 542, 80 A. 127 (1911) (photograph introduced to illustrate layout of land, curve of a railroad tract, and a railroad bridge); *State v. Ellwood*, 17 R.I. 763, 24 A. 782 (1892) (photograph taken shortly after defendant's arrest used for purpose of showing the difference in his appearance between the time of arrest and trial).

accurate representation of a scene personally viewed by that witness. *Bergner v. State,* Ind.App., 397 N.E.2d 1012, 1015 (1979). For example, exhibits 1 through 4, the bank surveillance photographs taken at the main office, were admitted as demonstrative evidence. Buzzell participated in the transaction that occurred at the main office. At trial, he stated that the pictures were a fair and accurate portrayal of the inside of the bank as it appeared on August 29, 1977.

Many other jurisdictions, however, have permitted photographs to be used as substantive evidence as well as merely demonstrative evidence. *United States v. Stearns,* 550 F.2d 1167 (9th Cir.1977); *United States v. Gray,* 531 F.2d 933 (8th Cir. 1976), *cert. denied,* 429 U.S. 841, 97 S.Ct. 117, 50 L.Ed.2d 110 (1976); *United States v. Taylor,* 530 F.2d 639 (5th Cir.1976), *cert. denied,* 429 U.S. 845, 97 S.Ct. 127, 50 L.Ed.2d 117 (1976); *State v. Kasold,* 110 Ariz. 558, 521 P.2d 990 (1974); *Fisher v. State,* 7 Ark.App. 1, 643 S.W.2d 571 (1982); *People v. Bowley,* 59 Cal.2d 855, 382 P.2d 591, 31 Cal.Rptr. 471 (1963); *People v. Doggett,* 83 Cal.App.2d 405, 188 P.2d 792 (1948); *Oja v. State,* 292 So.2d 71 (Fla.Dist.Ct.App. 1974); *Bergner v. State,* Ind.App., 397 N.E.2d 1012 (1979); *State v. Holderness,* 293 N.W.2d 226 (Iowa 1980); *Litton v. Commonwealth,* 597 S.W.2d 616 (Ky.1980); *State v. Young,* 303 A.2d 113 (Me.1973); *Sisk v. State,* 236 Md. 589, 204 A.2d 684 (1964); *King v. State,* 108 Neb. 428, 187 N.W. 934 (1922); *People v. Byrnes,* 33 N.Y.2d 343, 308 N.E.2d 435, 352 N.Y.S.2d 913 (1974); *State v. Hunt,* 297 N.C. 447, 255 S.E.2d 182 (1979); *Dunford v. State,* 614 P.2d 1115 (Okl.Cr.App.1980); *State v. Brown,* 4 Or.App. 219, 475 P.2d 973 (1970); *State v. Goyet,* 120 Vt. 12, 132 A.2d 623 (1957); *Ferguson v. Commonwealth,* 212 Va. 745, 187 S.E.2d 189 (1972), *cert. denied,* 409 U.S. 861, 93 S.Ct. 150, 34 L.Ed.2d 108 (1972). Writers and commentators have likewise urged that photographs should be used as substantive as well as demonstrative evidence. *See generally McCormick's Handbook of the Law of Evidence* § 214

(2d ed. Cleary 1972); 2 Scott, *Photographic Evidence* § 1001 (2d ed. 1969); Gardner, *The Camera Goes to Court,* 24 N.C.L.Rev. 233 (1946). Used in this manner, photographs become independent "silent witnesses." *People v. Bowley,* 59 Cal.2d 855, 859, 382 P.2d 591, 595, 31 Cal.Rptr. 471, 474–75 (1963). Thus, a witness need not testify that the photograph accurately represents what he observed; the photograph, once properly admitted, "speaks for itself." III *Wigmore on Evidence* § 790 (Chadbourn rev.1970).

In *United States v. Taylor,* 530 F.2d 639 (5th Cir.1976), the Fifth Circuit applied the "silent witness" theory to photographs taken by an automatic camera. That case involved an appeal from a bank robbery conviction. During the crime the robbers ordered everyone present into the bank vault. A bank camera, tripped after the bank personnel were locked in the vault, took photographs of the robbers. Even though no one testified that the photographs accurately represented the bank's interior or the events that occurred, they were admitted into evidence as silent witnesses. The court held that other testimony provided a proper foundation for the admission of the photographs by establishing the manner that the film was installed into the camera, how the camera was activated, the time the film was removed from the camera, the chain of custody of the film, and the fact that the film was properly developed and contact prints made from it.

Other courts have permitted the admission of photographs under the silent witness theory even though there was no direct testimony concerning the time or date the photo was taken. For example, in *Litton v. Commonwealth,* 597 S.W.2d 616 (Ky.1980), the Supreme Court of Kentucky upheld the admission of photographs taken by an automatic camera while a burglary was in progress at a drugstore. The camera was attached to the alarm-system pedestal. When the investigating officers arrived at the pharmacy, they discovered that the

wires to the burglar-alarm system had been pulled or cut apart. Later that day, the officers found the automatic camera about 150 feet away from the pharmacy. The wires to the camera matched the ones remaining in the pharmacy. The officers turned the camera over to the owner of the pharmacy who removed the film and sent it to the installer of the burglar alarm. The installer later returned the photographs. The owner of the pharmacy testified that the burglar-alarm system was only activated during nonbusiness hours. The defendant challenged the admission of the photographs because he claimed that the commonwealth had not established the time that the photographs were taken. He asserted that the camera could have been activated while he was shoplifting in the pharmacy during business hours rather than burglarizing it at night. The court dismissed this argument and held that "there was sufficient evidence of the reality surrounding the photographs to remove the question of timing from speculation. 'Even if direct testimony as to foundation matters is absent, however, the contents of a photograph itself, together with such other circumstantial or indirect evidence as bears upon the issue, may serve to explain and authenticate a photograph sufficiently to justify its admission into evidence.'" *Id.* at 619–20 (quoting *United States v. Stearns,* 550 F.2d 1167, 1171 (9th Cir.1977)).

In a similar case, *State v. Holderness,* 293 N.W.2d 226 (Iowa 1980), the Supreme Court of Iowa admitted photographs even though no one testified how or when they were taken. That case involved the theft of an insurance adjuster's CB radio and briefcase. These articles were stolen from his automobile, which was parked inside a rented garage near his house. The insurance adjuster had closed the garage door during the evening. The following morning he saw that the doors were open even though no one had permission to open them or to remove anything from the garage. An instamatic camera had been inside the insurance adjuster's stolen briefcase. The camera was equipped with a flash for night pictures. The insurance adjuster had taken eight pictures with the camera, leaving four pictures unexposed on the twelve-exposure roll of film. Approximately two hours after the insurance adjuster discovered the theft, a small boy brought him a roll of the type of film that had been in the camera. The insurance adjuster sent the roll of film to the developer. When he received the prints, he recognized prints one through eight as photographs he had taken. The roll, however, produced two more photographs that apparently had been taken with a flash. One of these photographs portrayed a young man on his knees looking sideways toward the camera while holding a partially open black brief case and a small flat object. In the background was a boat that the insurance adjuster identified as his. The prosecution contended that the photograph portrayed the burglar. The trial court admitted the photographs, and the Iowa Supreme Court affirmed.

Perhaps the most liberal application of the silent witness theory of photographs is found in *United States v. Stearns,* 550 F.2d 1167 (9th Cir.1977). In that case, the Ninth Circuit upheld the admission of photographs even though there was an absence of direct testimony as to foundation matters. That case involved the theft of a sail boat, the *Sea Wind,* whose owners, a couple by the name of Graham, mysteriously disappeared while their boat was anchored in Palmyra, an uninhabited island 1000 miles south of Hawaii. The defendant, Stearns, and her companion had also sailed to Palmyra on their vessel, the *Iola.* This vessel had a broken motor and it was doubtful whether it was sufficiently seaworthy either for a return voyage to Hawaii or for a trip to Fanning Island, the nearest available place to obtain equipment and supplies. The *Sea Wind* was later recognized in Honolulu. It was registered under another name and had been partially repainted.

Stearns was charged with theft of the *Sea Wind.* She claimed that after the Grahams disappeared, she and her companion sailed the *Sea Wind* to Hawaii in order to

protect it from vandalism, and that she intended to contact a relative of the Grahams in order to deliver possession of the ship to them. She also claimed that they attempted to tow her boat, the *Iola,* behind the *Sea Wind,* but that the *Iola* stranded on a reef in the channel that leads from the Palmyra Lagoon to the ocean.

The government offered a different explanation. The prosecution contended that Stearns and her companion intended to steal the *Sea Wind.* To facilitate their crime, they deliberately sank the *Iola,* a leaky boat they no longer needed, in the depths of the ocean away from the island. In support of its case, the government offered five photographs that were obtained from a roll of film that the defendant had developed in Honolulu. Each photograph portrayed a blue and white sailboat, not in tow, but under full sail at open sea. Testimony established that the blue and white vessel was the *Iola.* One of the photographs also depicted part of the deck of a second ship and rigging in the foreground of that photograph. There was open sea between the vessel on which the photos were obviously taken and the *Iola.* The government presented evidence that the vessel in the foreground of this photograph was the *Sea Wind.* The defense objected to the introduction of the photographs, contending that the foundation was insufficient to establish the time and place the photographs were taken. The court rejected this argument and held that even though no witness testified explicitly where the pictures were taken, the photographs could be used to make references bearing on their own foundation. In so holding, the court stated:

"Part of the evidence bearing on authentication is circumstantial, derived from testimony about other matters. A critical part of the foundation, that relating to time, is derived only by referring to one of the photographs. In this respect the case is rather unusual, for that photograph by itself establishes a necessary element of its authenticity. No witness testified explicitly, during the Government's case in chief, where or when the pictures were taken or what they represented. Even if direct testimony as to foundation matters is absent, however, the contents of a photograph itself, together with such other circumstantial or indirect evidence as bears upon the issue, may serve to explain and authenticate a photograph sufficiently to justify its admission into evidence." *Id.* at 1171.

Because the evidence established that the *Iola* remained in Palmyra harbor during Stearns' and her companion's stay on the island, the photograph could only have been taken before the *Iola* reached Palmyra or after its departure. Additional evidence established that the photographs could only have been taken on the return voyage to Hawaii, thus refuting Stearns' contention that the *Iola* sank just outside of Palmyra Lagoon.

Perhaps the situation factually closest to that in the case before us involves the use of photographs taken by a regiscope. The regiscope takes a simultaneous picture of the check, the person presenting the check, and the identification presented by that person. This equipment is commonly used in retail establishments. Regiscope photographs are often admitted as substantive evidence in forgery prosecutions despite the inability of the clerk who cashed the check to remember the particular transaction. Typically, courts require foundation testimony that includes demonstrating that the picture was taken when the forged check was passed and showing the proper functioning of the camera and processing of the photograph. It is for the trier of fact to determine whether the person pictured in the photograph is the defendant. *United States v. Gray,* 531 F.2d 933 (8th Cir.1976); *Ferguson v. Commonwealth,* 212 Va. 745, 187 S.E.2d 189 (1972), *cert. denied,* 409 U.S. 861, 93 S.Ct. 150, 34 L.Ed.2d 108 (1972).

This court has always allowed the admission of X-ray photographs into evidence even though no one can testify from *direct* observation inside the body that they accu-

rately represent what they purport to show. *Williams v. Altruda*, 74 R.I. 47, 58 A.2d 562 (1948). Such a situation is not different in principle from the case before us. In *Williams*, this court stated that "[an X-ray] film is sufficiently authenticated for admission if there is evidence showing that it was taken by a properly qualified expert, that is, one who is familiar with X-ray techniques and procedures, and that the film is a true representation of what it purports to represent." *Id.* at 55, 58 A.2d at 566. By its very nature, this testimony must be based upon the scientific fact that an X-ray photograph does reliably picture the shadows of internal objects. 3 Scott, *Photographic Evidence*, § 1262 (2d ed. 1969). Therefore, although the expert does explain the X-ray photograph to the jury and it is admitted as demonstrative evidence, in reality, the X-ray is substantive evidence.

■ We can think of no valid reason why a photograph may not, if properly authenticated, be admitted as substantive evidence. We have always allowed witnesses with less than perfect eyesight to testify to what they recalled seeing, even after the eroding effect of the passage of time has advanced the process of forgetting. We believe there is no logic in excluding a photograph that records an event with minute accuracy and precision, when the taking of the photograph has been reliably established. We hold, therefore, that a photograph may be admissible as substantive evidence rather than solely as illustrative evidence to support a witness's testimony, provided that sufficient foundation testimony is given to show the circumstances under which the photograph was taken and the reliability of its production process.

We emphasize that we are not changing existing Rhode Island law. Rather, we are adding a second basis for the admission of photographic evidence. Our holding today in no way affects the use of photographs as demonstrative evidence.

■ The foundation required for the admission of a photograph as a "silent witness" is obviously different from the foundation required for demonstrative evidence. The party seeking to admit the photograph must be able to establish its competency and authenticity. In making this showing in a case such as this, where the photographs are taken by an automatic camera, the trial justice should look for reliable evidence that verifies the accuracy of the photograph. Such evidence includes but is not limited to (1) testimony that the photograph has not been altered in any significant respect, (2) testimony on how the camera was activated, (3) evidence of the time interval between frames, if applicable, (4) evidence of the date the photographs were taken, (5) the chain of custody of the film after its removal from the camera, and (6) testimony of a competent witness who can explain what the photograph portrays even though he was not present when the photograph was taken. *See Bergner v. State,* 397 N.E.2d at 1017. These guidelines need not be applied in a rigid fashion. The trial justice should take into account any additional factors that establish the authenticity of the photograph. Whether or not a sufficiently strong foundation has been laid is left to the sound discretion of the trial justice and is reviewable only for an abuse of discretion. *See State v. Sangermano,* 111 R.I. at 203, 301 A.2d at 84.

■ Turning to the facts of the case at bar, we believe the trial justice did not abuse his discretion by determining that the state provided a sufficient foundation for the admission of the photographs taken at the Westminster Mall branch of People's Bank. First, the testimony of Vincent, the bank security officer who is responsible for overseeing the automatic cameras at the branches of People's Bank, established that the cameras are activated automatically before the bank opens in the morning and automatically shut off in the evening. Also, he established that the films are processed by Distribution Associates in Needham Heights, Massachusetts, which maintains a three-year negative file of all the film taken at the branches. Vincent further testified that each branch bank has a

camera that takes time-lapse photographs at time intervals between thirty and forty seconds. In order to pinpoint the time and date, each camera is pointed at a clock and daily calendar. According to Vincent the bank managers are responsible for advancing the calendar date and occasionally, they or the person they designate forget to advance the date. He also testified that even though the calendar in the Westminster Mall photographs indicated they were taken on August 25, 1977, they were actually taken on August 29, 1977. He stated that Distribution Associates was able to verify the date through their daily process, which involves counting blank spaces on the roll of negatives. Each roll of film usually lasts a week and Distribution Associates assigns it a number. Because the camera automatically shuts off when the bank is closed, each blank space on the negative roll represents a day change. Vincent stated that he determined that the photographs in question were processed from negative number 734054 and were taken at the Westminster Mall branch of People's Bank on August 29, 1977. The inaccurate date bears on the weight the jury might accord the evidence, but it does not bar its admissibility.

Vincent also provided a link between photographs of Dena and Pulphus at the main branch and those at the Westminster Mall branch. The photographs taken at the Westminster Mall branch, he said, were a fair and accurate portrayal of the interior of the bank. Upon comparing a photograph taken at the Westminster Mall branch with one taken at the main office, Vincent stated that both portray an elderly lady accompanied by another woman. This woman is wearing the same garb in both scenes and there is a time differential of twenty-five minutes on the clock in the two sets of photographs. This testimony, in conjunction with that of Guy Buzzell and Officer Trafford, laid a proper foundation for the introduction of the Westminster Mall photographs. Buzzell verified the photographs that were taken at the main office. In those photos, he identified Dena in the company of another woman. Detective Traf-

ford identified both Dena and Pulphus in the Westminster Mall photographs.

■ Pulphus incorrectly claims that Vincent could not authenticate the photographs because he was not actually employed by the bank when they were taken. The bank security officer at the time the photographs were taken could not have authenticated them any more accurately or personally than did Vincent, the security officer at the time of trial. The cameras were activated automatically and the photographs were not actually created by one individual, as for example a business record might be. Vincent explained how the cameras were activated, he knew the time intervals between frames and was able to verify the date the photographs were taken. He also testified about the chain of custody after the film was removed from the camera. The only factor of the criteria of which we made particular mention that Vincent did not testify to was whether or not the photograph was altered. However, there is no reason to believe, and Pulphus does not claim, that the photographic process was tampered with or that the photographs were distorted. On the contrary, the evidence establishes that the negatives were properly developed and maintained by a responsible business enterprise whose business it was to maintain them. In view of the record, we cannot say that the trial justice abused his discretion by admitting the photographs.

## II

Prior to trial, defense counsel sought to suppress Hannah and Paul Field's testimony relating to their identification of Pulphus from a photographic array. Defense counsel claimed that the array was unnecessarily suggestive because it contained two photos of Pulphus, both of which contained out-of-state designations. In rejecting this contention, the trial justice stated:

"I am satisfied that there was no attempt on the part of the police officer to make any suggestion whatsoever to Hannah

Field or her husband. There is no evidence to indicate that the manner of conducting the viewing was in the least suggestive. I don't believe that there was any attempt by the police [sic] including two photographs of the same woman. Apparently, the hairdo was different, and in one photograph the subject was wearing glasses. All of these things make a tremendous difference in the appearance of the person. On the basis of the evidence that's been presented in court, the motion to suppress the in-court identification is denied."

On appeal, Pulphus claims that the trial justice erred in ruling that the identification procedure was not unnecessarily suggestive. She urges that under the rule of *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the matter should be remanded to the trial justice with directions that he make findings on the likelihood of pretrial misidentification or the existence of a tainted in-court identification.

■ *Manson* involved a challenge of an identification made by an undercover narcotics agent. The agent described to a police officer a person who had sold him drugs. The officer, thinking he recognized the description, procured a photograph of the suspect and left it in the agent's office. Subsequently, the agent looked at the photograph and concluded that the man pictured had previously sold him the narcotics. The trial justice allowed the photograph into evidence as an out-of-court identification of the defendant and the Supreme Court of Connecticut affirmed. The defendant later brought a petition for habeas corpus in Federal District Court, which was dismissed. On appeal, however, the Second Circuit reversed. The Supreme Court reversed the Second Circuit and upheld the trial court's admission of the identification testimony, indicating that even if an identification procedure is unduly suggestive, there is no per se rule of exclusion. Rather, a court must look to the totality of the circumstances surrounding the identifica-

tion to determine its reliability, and therefore, its admissibility.

■ We now turn to the first aspect of the *Manson* test, namely whether the photographic array was suggestive. Although other courts have held that including two photographs of a suspect within a photographic array is suggestive, *see United States v. Mears*, 614 F.2d 1175 (8th Cir.), *cert. denied*, 446 U.S. 945, 100 S.Ct. 2174, 64 L.Ed.2d 801 (1980); *State v. Kasper*, 137 Vt. 184, 404 A.2d 85 (1979), we believe the unique circumstances in this case justify the inclusion of two photographs. In a case similar to ours, the New Jersey Supreme Court concluded that the inclusion of two photographs of the defendant in a photographic array was not unnecessarily suggestive. *State v. Thompson*, 59 N.J. 396, 283 A.2d 513 (1971). The defendant was dressed differently in each photograph. His eyes, complexion, and hair length appeared different in each photograph. The court found no error because the photographs were sufficiently dissimilar. In the situation before us, the photographs of Pulphus are also sufficiently dissimilar. One photograph depicts her wearing large sunglasses, and an Afro-type hair style. The other photograph which was taken nearly three years earlier, depicts her without sunglasses and straight hair. In addition, the out-of-state designations did not draw attention to Pulphus because both Hannah and Paul Field stated that they were unaware of the designations when they viewed the photographs.

■ Although it is not necessary to reach the second step of the *Manson* analysis, a brief examination of the circumstances surrounding the identification indicates its reliability. First, both Hannah and Paul had an excellent opportunity to view Pulphus shortly after the crime. She was in their home for about an hour, they sat next to her and spoke with her. Second, upon viewing the photographs, both Hannah and Paul identified Pulphus. Last, because the time between seeing Pulphus and the photo

identification was less than a month, their memories were still strong.

For the reasons stated, the appeal of the defendant is denied and dismissed, the judgment of the Superior Court is affirmed, and the papers in the case may be remanded to the Superior Court.